CFMT, INC. and CFM Technologies, Inc., Plaintiffs,

v.

STEAG MICROTECH INC., Defendant.

No. CIV.A. 95–442–RRM.

United States District Court,
D. Delaware.

June 18, 1998.

**574**

Edward B. Maxwell, Josy W. Ingersoll, John W. Shaw, Young, Conaway, Stargatt & Taylor, Wilmington, Thomas B. Kenworthy, Morgan, Lewis & Bockius, Philadelphia, PA, Edmund R. Pitcher, Douglas J. Kline, David C. Berry, Stephen D. Whetstone, Testa, Hurwitz & Thibeault, Boston, MA, for Plaintiffs.

Rudolf E. Hutz, Arthur G. Connolly, Jr., Patricia S. Rogowski, Connolly, Bove, Lodge & Hutz, Wilmington, G. Thomas Delahunty, Brooks Haidt Haffner & Delahunty, New York City for Defendant.

## OPINION

MCKELVIE, District Judge.

This is a patent case. Plaintiff CFMT, Inc. is the owner and assignee of U.S. Patent No. 4,911,761 ("the '761 patent"). The '761 patent discloses a process and apparatus for drying surfaces, such as the surfaces of semiconductor wafers. Plaintiff CFM Technologies, Inc. is the exclusive licensee of the '761 patent. CFM Technologies, Inc. is the parent and sole shareholder of CFMT, Inc. Defendant Steag Microtech, Inc. ("Steag") sells a "Marangoni Dryer" within the United States that is used to dry semiconductor wafers.

On July 10, 1995, plaintiffs (collectively "CFMT") filed a complaint alleging that defendant Steag has infringed one or more claims of the '761 patent, either literally or under the doctrine of equivalents. On July 31, 1995, Steag filed an answer denying infringement and asserting several affirmative defenses. These defenses include that the claims of the '761 patent are invalid for anticipation and obviousness, that the claims are invalid because the claimed invention was on sale or in public use more than one year prior to the date of application, and that the patent is unenforceable due to CFMT's inequitable conduct during the patent prosecution.

On November 24, 1997, the court held a hearing in accordance with *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996), to construe disputed claims of the '761 patent. On December 2 through 11, 1997, the court held a jury trial on the issues of infringement, validity, and unenforceability. On December 12, 1997, the jury returned its verdict. The jury found that operation of Steag's Marangoni dryer literally infringes claims 1, 8, 17, and 22 ("the asserted claims") of the '761 patent, that Steag has actively induced users of the Marangoni Dryer to infringe on the asserted claims, and that Steag has contributorily infringed those claims. The jury also found that Steag failed to establish that the asserted claims are invalid. Finally, the jury found that Steag failed to show that the '761 patent is unenforceable due to inequitable con-

duct. The jury awarded CFMT damages of $3,105,000.00.

During trial, Steag moved for judgment as a matter of law ("JMOL") on the issues of infringement, validity, and unenforceability. On December 26, 1997, Steag renewed its motion for JMOL. Alternatively, Steag moved for a new trial. On December 29, 1997, CFMT moved for treble damages and a finding that the case is "exceptional" under 35 U.S.C. § 285. This is the court's decision on those motions.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The court draws the following facts from the pre-trial order and the testimony and evidence presented at trial.

### A. Computer Chip Manufacturing

Modern computers, and many everyday appliances, use "computer chips." Computer chips contain miniature electronic circuits. A computer chip consists of a sliver of silicon ("a semiconductor wafer"), a surrounding case that protects the silicon, and wires that extend from the silicon and enable the computer chip to interact with the equipment in which it is used.

Computer chip manufacture takes place in a process with three major steps. In the first step, a wafer of pure silicon is produced. Next, this wafer goes to a "wafer fabrication" plant. Finally, the manufacturer mounts the wafer in a case and attaches wires to it.

The patent in suit relates to the second step—wafer fabrication. In wafer fabrication, the manufacturer imprints circuitry onto the silicon wafer. The manufacturer imprints these circuits by shooting light images onto the wafer, much like a photograph is shot onto film. Between each photographic shot, the manufacturer performs various processing steps. These processing steps often include applying chemicals to the wafer ("wet processing") for etching, cleaning, or developing. The processing also adds different layers and coatings to the wafer between each photographic shot. Wafer fabrication

usually takes two to three months to complete, and results in a semiconductor wafer.

During wafer fabrication, the wafers can often be exposed to contaminants and airborne particles. This contamination can be detrimental to the microscopic circuits which the wafer fabrication process creates. As the process adds layers and coatings to the wafer, contaminants can become trapped in the semiconductor. Thus, between each chemical processing step, the wafers must be washed and dried in a way that reduces the chances that any impurities or chemical residue are left on the wafer surfaces.

During this rinsing and drying process, a premium is placed on not only producing a clean and dry wafer, but doing so in a way that reduces the chances of streaking or water marks. Water streaks and water marks can interfere with the semiconductor's circuits in the same way that contaminants do. Rapid drying methods are preferred, since allowing water to simply evaporate into the air from the wafer surfaces can leave these streaks and marks.

Conventionally, semiconductor wafers were dried by the use of a spin-rinser-dryer, which uses centrifugal force to throw water off of the wafers. This process, however, subjects the wafers to mechanical stress, and may allow contamination or the buildup of static electric charges on the wafer surfaces. Electric charges attract contaminants when the wafers are exposed to the air.

### B. *CFMT*

In 1984, Christopher McConnell and Roger Carolin started a company called CFM Technologies. McConnell and Carolin knew each other from Harvard University, where they attended business school together. McConnell had a degree in chemical engineering, and Carolin had a degree in electrical engineering. They decided to form a company to develop and market an apparatus for chemical processing of semiconductor wafers.

The two co-founders began developing a "process flow vessel" for this chemical processing. They used the basement in McConnell's father-in-law's house in Pennsylvania as their office. In the summer of 1984, after Carolin decided to move to Florida, McConnell hired Alan Walter. Walter is a chemical engineer whom McConnell met while working before he enrolled in business school. Walter and McConnell continued to develop chemical processing equipment. They eventually developed a process that they termed the "Full Flow" process.

### C. *The '532 Patent*

On August 13, 1985, Walter and McConnell applied for a patent on the Full Flow process. The PTO issued U.S. Patent No. 4,778,532 ("the '532 patent") to McConnell and Walter on October 18, 1988. CFM Technologies is listed as the assignee of the '532 patent.

The '532 patent is entitled "Process and Apparatus for Treating Wafers With Process Fluids." The '532 patent discloses the Full Flow method for cleaning and wet processing semiconductor wafers. It describes an apparatus that pumps fluids into the enclosed vessel where the wafers remain stationary. It explains that the system allows fluids (gases or liquids) to flow past the wafers "sequentially and continuously." The apparatus then drains the fluids out the bottom as new fluid comes in the top for rinsing or drying. The specification lists as advantages of this system the reduced contamination risk (since the wafers do not move from one place to another), the increased control over the flow of chemicals and the amount of time that the wafers are exposed to those chemicals, and the safety to users (since the system is enclosed).

The '532 patent specification describes a drying method that it calls "chemical drying." In chemical drying, a "drying fluid" drives the rinsing fluid off of the wafers, and then a "predried gas, preferably an inert gas such as nitrogen" evaporates the drying fluid. The specification lists isopropanol (IPA), which is similar to rubbing alcohol, as the preferred drying fluid.

At trial, McConnell described the way that he and Walter developed the IPA drying process that they claimed in the '532 patent. He explained that he had worked in labs where chemists dried test tubes and beakers by dousing them with alcohol, shaking them

off, and then putting them in racks. He claimed that this had always produced very clean, dry beakers and test tubes. He testified that alcohol facilitates drying because it reduces the surface tension of water, thus causing water droplets to run off of surfaces instead of clinging to them. He explained that he and Walter designed the system so that IPA vapor came into the chamber as the water drained out. The IPA would condense on the wafer surfaces and cause the water to run off. They would then purge the chamber with nitrogen. He testified that "the whole thing [was] dry and actually very clean." It looked "really good" and produced "terrific wafers."

### D. The Full Flow System

CFMT began its marketing efforts for the Full Flow system in 1986. CFMT often referred to the system's drying method as one of its strengths. For instance, CFMT put together a brochure ("the 1986 brochure") entitled "Full Flow Semiconductor Wet Processing." Under the section headed "Wafer Drying," the brochure claimed that CFMT "has developed an extremely clean and simple drying technique based on isopropyl alcohol." It described the drying process as follows:

> After the wafers have completed their prior wet processing steps, but while the wafers are still completely immersed in ultra-pure water, filtered IPA vapor is introduced to the top of the wafer vessel and a drain is opened out the bottom. As the system drains, IPA vapors flow in, replacing the water.

The brochure lists the lack of "particle generation," the lack of "streaking or staining," and "very fast drying" as benefits of the Full Flow drying method. It claims that wafers "emerge bone-dry from the drying step" and have "exceptionally low particle counts."

On October 16, 1986, CFMT announced in a press release ("the Rodel press release") that it had "joined forces" with Rodel Products Corporation ("Rodel") to market the Full Flow system. The Rodel press release states that the system takes wafers "to complete dryness." It also states that "the wafers never move until they emerge clean and dry." The Rodel press release claims the Full Flow system is "more effective in controlling particles than other automated units."

CFMT announced the production of the Full Flow system in the February 1987 issue of a trade magazine called *Semiconductor International* ("the 1987 advertisement"). The 1987 advertisement describes a process that brings semiconductor wafers "to complete dryness" using isopropanol vapors. The advertisement claims that the system allows "more effective control of particles."

### E. The Beta Test With Texas Instruments

In late 1986, through its connections with Rodel, CFMT reached an agreement with Texas Instruments ("TI") to run a "beta program" at TI's Sherman, Texas plant. The program required CFMT to ship a Full Flow vessel to TI before receiving payment. TI agreed to purchase the equipment if it met certain performance criteria. CFMT shipped out a Full Flow vessel to TI on December 23, 1986. In early 1987, it shipped out additional subsystems to TI. CFMT employees, including McConnell and Walter, took turns visiting TI in order to help set up the system and to take part in the testing of the equipment.

In 1987, CFMT sent out a "Technical and Marketing Report—1986" to its investors. The report does not bear a date on it, but appears to have been sent out in early 1987, since it refers to the February advertisement in *Semiconductor International* as having come out "recently." The report summarizes the progress the company made in 1986, and its plans for 1987. The report describes CFMT's relationship with Rodel, and the beta program agreement with TI. The report notes that while "[i]nitial TI data are encouraging," there are still "high risks" and that "Full Flow technology has yet to produce a single wafer confirmed commercially clean."

In a letter to a CFMT investor on May 15, 1987, McConnell writes that the "Full Flow wet processor has performed admirably during its maiden voyage at Texas Instruments." He claims that TI officials had described the

"beta-test start-up [as] one of the smoothest that they have ever witnessed." He states that CFMT had made "dramatic strides in hardware enhancements for the isopropanol vapor drying system," but notes that there was still a "nagging problem with the centermost wafers in the vessel."

At trial, both McConnell and Walter explained that the results at TI at first appeared good—the same as they were in CFMT's factory in Pennsylvania. However, McConnell testified that TI eventually looked at the wafer surfaces with a "particle scanner." A particle scanner is an instrument that uses a laser to detect very small particles. McConnell testified that, upon looking at the wafers through a particle scanner, TI and CFMT discovered that results were "terrible." They found hundreds of particles on what had appeared to be clean wafers.

Walter testified that when TI discovered this "dirty wafers" problem, they first assumed that the equipment just needed to be cleaned out. CFMT and TI checked each of the connections, replaced some valves, and flushed the entire system with ultra-pure water for several days. This cleansing procedure decreased particle count, but did not eliminate the problem. Walter testified that, in April 1987, after several weeks of analysis, he concluded that there was a problem with the drying step in the Full Flow process.

Walter and McConnell each testified about the analyses they performed on the Full Flow system to determine how they might alter the drying process so that it did not leave particles on the wafers. Walter testified that he wanted to alter the pressure of the IPA as it entered the chamber. In May, 1987, he replaced the Teflon valve that fed IPA into the chamber with a stainless steel valve, so that it could withstand a pressure drop.

A May 28, 1987 memorandum titled "IPA Drying Experimental Program" written by McConnell lists several experiments and tests that CFMT wanted to perform on the drying process. It lists different parameters that CFMT would vary, such as "warm vs. cold nitrogen dilution," "different water temperatures," "solvent variations," and "hardware variations."

One of the headings in the memorandum is "Runs in Full–Scale Clear Vessel." Walter testified that in June 1987, McConnell sent him a clear vessel at TI so that he could actually watch the drying process. He described this experience as "nirvana." He was able to watch the process for the first time as it happened, and he saw "all these droplets of rain coming down and ... all this condensation." After running more tests with the particle scanner, Walter concluded that there was a correlation between water droplets left on the wafers and the particles they discovered on the wafers after the drying process.

Walter testified that he began varying the speed at which the vessel drained. He varied the temperature of the rinse water. He also reduced the number of wafer carriers in the chamber, so that they were not stacked. He explained that higher carriers drip onto lower ones, leaving water droplets on the lower wafers.

On July 1, 1987, Walter sent a fax to Joan Koppenbrink, CFMT's salesperson at Rodel. He states that CFMT has "eliminated streaking on bottom wafers, and ... have consistent particle counts on the top and bottom wafers for several of the runs. The optimum conditions appear to be with the valve between 1/3 and 2 turns open." The second page of the fax is a chart that plots "Linear flowrate" on the x-axis and "Drops from the first carrier" on the y-axis. Walter testified that he measured the number of drops by simply counting how many droplets he could see falling from the wafers as the vessel drained. Walter plotted several lines on the chart, for different water temperatures. The chart shows that the number of drops approach zero when the flow rate is at about 2.0 inches per minute, and the water temperature is 90 degrees Celsius. On the top of the chart, it indicates that Walter was introducing the IPA to the chamber at a pressure of 22 to 30 pounds per square inch, and then reducing it to very low pressure. He testified that this drop in pressure created "a very dry vapor."

Walter testified that by the summer of 1987 "we had [the problem] licked and we

were getting good results." McConnell testified that they had a "big breakthrough in ... June [of 1987]." By slowing the rate of descent, and controlling vapor pressure and water temperature, the process eliminated condensation on the wafers. On April 20, 1988, McConnell and Walter applied for a patent on this process, and the PTO eventually issued the '761 patent.

### F. *The '761 Patent*

The PTO issued the '761 patent on March 27, 1990. It is entitled "Process and Apparatus for Drying Surfaces." The patent lists CFM Technologies Research Associates as its assignee. On December 30, 1992, CFM Technologies assigned the '761 patent to CFMT, Inc., and CFMT Inc. made CFM Technologies the exclusive licensee of the '761 patent.

CFMT asserts that use of Steag's Marangoni dryer infringes claims 1, 8, 17, and 22. These claims read as follows:

1. A method for drying surfaces of objects which are suspended in a rinsing fluid comprising providing a drying vapor, replacing said rinsing fluid with said drying vapor by directly displacing said rinsing fluid from said surfaces with said vapor at such a rate that substantially no liquid droplets are left on the surfaces after replacement of the rinsing fluid with drying vapor.

8. A method according to claim 1 wherein said drying vapor is purged from said surfaces by introducing a dry, inert, non-condensable gas after replacement of said rinsing fluid.

17. A method according to claim 1 wherein substantially no rinsing fluid or drying vapor is removed by evaporation of liquid droplets.

22. A method according to claim 1 wherein said objects are semiconductor wafers.

In its "Background" section, the '761 specification describes the conventional spin-rinser-drier. It also refers to the newer methods using "steam or chemical drying of wafers," and specifically mentions the drying method in the '532 patent as an example. It explains that in methods such as the one disclosed in the '532 patent, there are "two steps. First, the rinsing fluid, preferably water is driven off the wafers and replaced by a nonaqueous drying fluid. Second, the nonaqueous drying fluid is evaporated using a predried gas."

The specification goes on to describe the claimed invention. It explains that, in the '761 process, CFMT believes it "to be important that the downward velocity of the [rinsing fluid] be controlled at a relatively slow rate." It notes that descent rates of one to four inches per minute have been found to be satisfactory, but that rates of over five inches per minute "yield poor results." The specification also recommends using "warmer vessel temperatures."

The specification states that "it is preferred that the drying vapor be miscible with water and form a minimum boiling azeotrope with water, isopropanol being a particularly preferred drying vapor." A substance is miscible with another when it can be freely mixed with that substance in any proportion. An azeotrope is a mixture of two substances in such a proportion that they do not separate when boiled. The specification goes on to recommend that the drying vapor be "substantially pure and either saturated or preferably superheated, and the surfaces should be heated to a temperature near to but preferably below that of the drying vapor prior to contact." The specification notes that "this may result in some condensation of vapor on the surfaces, and too much condensation should be avoided, [but] it has been found that preheating to above the temperature of the drying vapor yields poorer results."

The specification explains that one of the surfaces in which the drying fluid condenses is the surface of the rinsing fluid. This condensation forms a "distinctive drying fluid layer" that is "more than one half inch in thickness in some cases." At trial, McConnell testified that CFMT prefers to run the process so that this IPA layer forms on top of the rinsing fluid. He stated that CFMT believes "it makes the [process] more robust." That is, it facilitates cleaning and drying by trapping particles and letting the

water pull them down as it drains off of the wafer.

The specification explains the way in which CFMT believes its drying process works. It explains that "it is believed that the method of the invention involves a physical pushing by the vapor or pulling by the liquid surface, resulting in direct displacement by vapor for liquid rather than an evaporation of liquid droplets."

### G. Marketing of Full Flow System

CFMT has marketed and sold Full Flow equipment, incorporating the '761 drying process, since 1987. McConnell testified that the company charges between $2 million and $3 million per unit, and has sold almost 200 units around the world. Pam McCardell, CFMT's vice president of North American sales, testified that the Full Flow system won the 1995 Best Product Award from *Semiconductor International.* McCardell also testified that all Full Flow systems now use the direct displacement drying method described in the '761 patent. Roger Carolin testified that the drying step is a fundamental part of any cleaning process, and that the '761 patent is the most important patent that CFMT owns. McConnell described the '761 patent as the "crown jewel" of the company. However, McConnell admitted on cross that when CFMT attempted to sell a stand-alone dryer using the '761 technology, it was a "short-lived effort," and that CFMT was only able to sell three such units.

### H. The Steag Marangoni Dryer

On February 21, 1990, a Dutch company called N.V. Philips' Gloeilampenfabrieken ("Philips") filed a patent application in the European Patent Office. Philips is a large company that manufactures electronic equipment. On September 14, 1994, the European Patent Office issued Publication number 0–385–536–B1 ("the Philips patent"). The Philips patent claims a "method of treating substrates, in which the latter are immersed for some time in a bath containing a liquid and are then taken therefrom so slowly that practically the whole quantity of liquid remains in the bath."

On April 7, 1993, before the Philips patent issued, Philips entered an agreement ("the Philips–Steag Agreement") with Steag Laminarflow–Prozesstechnik GmbH ("Laminarflow"). Under the Philips–Steag Agreement, Philips transferred the "know-how" for the design and development of the drying equipment described in the Philips patent. On May 31, 1995, Philips entered into an amended agreement with Steag Microtech GmbH Donaueschingen ("Donaueschingen"), indicating that Laminarflow had transferred its rights and obligations under the Philips–Steag Agreement to Donaueschingen, and that Philips consented to this transfer. Donaueschingen is a subsidiary of Steag Industrie AG, which is the sole shareholder of defendant Steag.

Donaueschingen, using the Philips technology, eventually developed equipment for the process it calls "Marangoni drying." Steag's president, Johannes Brinkmann, testified at trial that Steag buys its Marangoni dryers from Donaueschingen, which in turn pays a royalty to Philips for each dryer it sells.

At trial, An–Ti Chai testified as an expert for Steag. Chai received a Ph.D. in physics from Kansas State University in 1968. He has spent the last 20 years working for NASA at the Lewis Research Center. He has focused on the study of "microgravity fluids and microgravity material science." His experience with wafer processing is limited to work he did with solar cells from 1976 to 1980.

Chai described the process that Steag uses in its Marangoni dryer. This process takes place in a drying chamber. There is a lid over the chamber, but Chai explained that it is "not tightly sealed. It is open to the environment." At the bottom of the chamber is a rinse bath (fresh deionized water) in a tank. Wafers are in a carrier above the rinse bath. First, the Marangoni dryer lowers the wafers into the rinse bath. The tank feeds water in from the bottom, so that water is constantly overflowing the sides of the tank. Next, the dryer introduces a gaseous mixture that is 2.5% IPA and 97.5% nitrogen through the lid on top of the chamber, so that it fills the space above the rinse bath. The Marangoni dryer then uses a thin knife

blade to push the wafers up out of the water from below. The knife blade pushes the wafers at a slow and steady rate. Chai stated that this rate was "approximately two inches per minute." The dryer then drains the rinse tank and blows nitrogen gas into the chamber to purge whatever vapor remains. Finally, the wafers are removed.

## I. *The Lawsuit*

On July 10, 1995, CFMT filed a complaint in this court, alleging that Steag has infringed one or more claims of the '761 patent, either literally or under the doctrine of equivalents. CFMT filed an amended complaint on September 29, 1995, adding Donaueschingen as a defendant. Steag filed an answer to the amended complaint on October 16, 1995. In its answer to the amended complaint, Steag denies infringement and asserts that the '761 patent is invalid and unenforceable. On April 28, 1997, the court dismissed CFMT's claims against Donaueschingen for lack of personal jurisdiction.

## J. *Claim Construction*

On November 24, 1997, the court held a hearing in accordance with *Markman v. Westview Instruments, Inc.,* 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996) to construe disputed terms in the claims of the '761 patent. The court issued an opinion construing disputed terms on November 25, 1997.

The court found that the language in the asserted claims requiring that the wafers be "suspended" in a rinsing fluid means that they are "hung or upheld, so as not to fall or sink." The court found that "drying vapor" means "a vapor that facilitates the removal of liquid from a surface." The court also found that the term "directly displacing" means "replacing with no intervening substance."

## K. *The Trial*

On December 2 through December 11, 1997, the court held a jury trial on the issues of infringement, validity, and unenforceability.

### 1. *Infringement*

On the issue of the Steag dryer's infringement of the '761 patent, CFMT presented testimony from Charles R. Helms and Srini Raghavan. Helms is a professor of electrical engineering at Stanford University, where he runs a large research program in the area of semiconductor technology, surface chemistry, and surface physics. Raghavan is a professor of material science and engineering at the University of Arizona in Tuscon. He teaches classes in surface chemistry. Both Helms and Raghavan went through each element of the asserted claims, and testified that the drying method practiced in Steag's Marangoni dryer performs all of the steps in claims 1, 8, 17, and 22 of the '761 patent.

Helms testified that he had looked at the '761 patent, and had studied the Steag dryer by reading documents and brochures, watching a Steag videotape, and witnessing the Steag dryer in person. CFMT played a videotape that Steag had produced, showing the Steag dryer and explaining how it works. Helms testified that Steag's process would not work without IPA, which he claimed helps force water off of the wafers like a "chemical squeegee."

Raghavan testified that he had read documents describing Steag's dryer, had watched a videotape of the process, and had read articles and papers on Marangoni drying. He testified that as he understands the language in the '761 patent, the Steag dryer infringes.

An–Ti Chai testified for Steag on the issue of infringement. Chai testified that the Marangoni dryer dries wafers by using the "Marangoni effect." He first explained that liquid molecules attract each other and create a "surface tension" at the liquid's surface. He next explained that the Marangoni effect is the phenomenon where fluid flows from areas with weak surface tension to areas with strong surface tension.

Chai testified that, in the Steag process, the IPA vapor introduced with nitrogen dissolves into the surface of the rinse bath. As IPA dissolves in water, it reduces the surface tension of the water. Chai explained that the IPA does not dissolve uniformly along

the rinse bath surface. As the wafer breaks the surface of the water, it pulls up some water that sticks to the wafer. The water surface ramps up towards the wafer. This curvature of water is called a "meniscus." Chai testified that as the IPA vapor dissolves into the water, the IPA concentration will be higher in the meniscus than it is in the areas further away from the wafer, because the meniscus is very thin in the area close to the wafer, but is thicker as one moves away from the wafer. The thicker layer of water disperses the IPA more quickly than the thin meniscus does. Thus, Chai testified that the greater IPA concentration in the water near the wafer will reduce the surface area to a greater extent than it will for areas away from the wafer, and the Marangoni effect will draw water away from the wafer.

Chai also explained that the water overflow in the rinse tank prevents the IPA from building up. This helps to flush the IPA from the rinse bath, so that the Marangoni effect can continue to pull water away from the wafer surface.

Chai testified that, in his opinion, the Steag process does not infringe the '761 patent for several reasons. First, the Steag process does not dry wafers that are "suspended," because the Steag process actually lifts the wafers out of the rinsing fluid, and does not simply hold them up. Second, Chai testified that the IPA/nitrogen mixture that Steag uses does not qualify as a "drying vapor." He explained that the nitrogen is not a vapor, and the IPA does not facilitate drying, but simply induces the Marangoni flow. Third, he testified that the Steag process does not involve the direct displacement of rinsing fluid with drying vapor. He reiterated that the Marangoni effect was the mechanism that dries the wafers in Steag's process. He explained that the level of the rinsing fluid does not change during the Steag drying process. He stated that the only displacement that occurs is water for the wafer solid (as the wafer is drawn out of the water, water fills in the space that the wafer once filled), and wafer solid for IPA vapor and nitrogen gas (as the wafer rises from the rinse bath, it fills space that the gas once filled). Finally, Chai testified that he had

seen the Steag dryer work effectively while raising the wafers at a speed of over 20 inches per minute. He pointed out that the '761 patent specification described lift rates of between 1 and 4 inches per minute.

Helms and Raghavan were both asked about the role of the Marangoni effect in Steag's drying process. Helms testified that he does not believe the Marangoni effect is a major reason that the Steag dryer works. However, he testified that even if the Marangoni effect were the dominant mechanism in the drying achieved by the Steag dryer, his opinion regarding infringement would not change, because the IPA vapor still "directly displaces" the rinsing fluid. Raghavan similarly testified that he did not believe that the "directly displaces" language precludes a dryer that uses the Marangoni effect from infringing the '761 patent's claims.

### 2. Invalidity

On Steag's affirmative defense that the '761 patent is invalid, Steag offered the testimony of Paul Neitzel. Neitzel is a professor at the Georgia Institute of Technology, in the school of mechanical engineering. He received a Ph.D. in fluid dynamics from Johns Hopkins in 1979. He testified that he had studied the prosecution histories and patents for the '761 patent and the '532 patent, as well as other pieces of prior art.

Neitzel testified that CFMT's 1986 brochure for the Full Flow process, published almost two years before April 20, 1988, when CFMT filed the application for the '761 process, fully describes the drying process claimed in the '761 patent. He pointed to the brochure's description of the drying process, which states that "filtered IPA vapor is introduced to the top of the wafer vessel" and that "IPA vapors flow in, replacing the water." He also pointed to the brochure's claim that the system produces "no particle generation" and "no streaking or staining." Neitzel went through each element of claims 1, 8, 17, and 22 of the '761 patent, and explained how each was disclosed in the 1986 brochure. Neitzel also testified that the advertisement for the Full Flow machine in the February 1987 issue of *Semiconductor International* describes the '761 process.

Neitzel also testified that several pieces of prior art rendered the '761 process obvious to one of ordinary skill in the art at the time that CFMT filed its patent application. He specifically referenced four patents. These are: (1) U.S. Patent No. 4,816,081 ("the Mehta patent"); (2) U.S. Patent No. 4,722,752 ("the Steck patent"); (3) U.S. Patent No. 4,736,760 ("the Coberly patent"); and (4) U.S. Patent No. 4,643,774 ("the Kishida patent"). CFMT does not dispute that each of these patents qualifies as prior art to the '761 patent, as each bears an application date more than one year prior to April 20, 1988.

### a. The Mehta patent

The Mehta patent is entitled "Apparatus and Process for Static Drying of Substrates." Mehta filed the patent application on February 17, 1987, and the Patent and Trademark Office ("the PTO") issued the Mehta patent on March 28, 1989. It discloses a process for drying semiconductor wafers, in which the wafers are held "in a static position to avoid the generation of undesired particulate."

The Mehta process involves positioning the wafers in a chamber, and then filling this chamber with processing fluid. A "vacuum valve" pulls all gas out of the chamber. Then another "vacuum assisted" drain valve is opened, and as the processing fluid drains out, "clean dry inert gas" is introduced from the top. The patent's abstract claims that this draining step "assures that any droplets remain with the draining fluid so that the [wafers] emerge dry." The patent specification explains that the inert gas can be "clean air, argon or, preferably, nitrogen." The specification describes the "preferred drain rate" as one gallon per minute. Neitzel calculated this rate to be between 2.1 and 3.7 inches per minute.

In the "Background of the Invention" section, the patent specification describes other types of drying equipment. It mentions that some systems use an "IPA dryer," and describes it as a dryer that involves "immersing the wafers in a liquid/gaseous bath of IPA ." The specification explains that "alcohol may leave organic residue remaining on the surface of the wafer as it evaporates." The

specification describes this as an "unacceptable drawback."

### b. The Steck patent

The Steck patent is entitled "Apparatus and Method for Rinsing and Drying Silicon Wafers." Steck applied for the patent on January 16, 1986, and the PTO issued the Steck patent on February 2, 1988. It discloses a method for drying silicon wafers by raising them slowly out of the rinsing solution, so that "the water surface tension at the surface of the water bath evenly and effectively draws off water from the rising surfaces of the wafers."

The patent calls for the wafers to be submerged in a tank filled with hot, deionized water. The wafers rest in a "cassette" (a wafer carrier). Water feeds into the bottom of the tank, so that the water is constantly overflowing the top of the tank. This overflow creates a skimming action on the water surface, which removes particles as they are washed off the wafers. The patent claims a "novel, vertical lift mechanism" that slowly lifts the wafers and the cassette out of the rinsing fluid, so that there is no contact between the cassette and the wafer at the point where the wafer crosses the surface of the water.

Above the tank, the process can include a "filtered, laminar flow of clean, dry air." The patent specification explains that when the wafers are pulled from the water so that "the wafer is in contact with no other object, the water is drawn uniformly from the wafers and the surface of the wafer rising above the water will be dry." The specification indicates that the rate of removal of the wafers should be "about two inches per minute."

### c. The Coberly patent

The Coberly patent is entitled "Apparatus for Cleaning, Rinsing and Drying Substrates." Coberly filed the patent application on September 15, 1986, and the PTO issued the Coberly patent on April 12, 1988. It claims a method for rinsing wafers and then removing them from the rinsing tank "at a slow, controlled rate" so as to "avoid the

need for a dryer independent of the rinse tank."

The patent discloses an apparatus that cleans the wafers in one tank (by using "megasonic energy") and then moves the wafers from the cleaning tank to a rinsing tank. The patent specification explains that the process can take place in a controlled environment, in which a "laminar flow system of hepifiltered air" is used. The patent specification also indicates that the typical rate of ascent of the wafers, as they are withdrawn from the rinsing tank, requires between 1 and 15 minutes to achieve total removal.

The specification explains that two factors in the patented method help produce dry wafers. First, the rinsing fluid in the Coberly method is supposed to be heated, to between 60 and 100 degrees centigrade. The specification explains that the heated fluid will have a lower surface tension, and thus will not adhere to the wafers very strongly as they rise out of the rinsing fluid. Second, the cleaning process in the Coberly method uses a solution containing ammonium hydroxide, hydrogen peroxide, and water. The specification claims that this solution adheres to the wafer surfaces, and then facilitates the flushing away of water molecules from the wafer surface when it is immersed in rinsing fluid. The combination of lower surface tension and the cleaning solution results in the wafers emerging from the rinsing fluid without any water on them.

#### d. The Kishida patent

The Kishida patent is entitled "Method of Washing and Drying Substrates." Kishida filed the patent application on April 17, 1985, and the PTO issued the Kishida patent on February 17, 1987. It discloses a method in which equipment oscillates the objects to be dried as it pulls them out of the wash liquid, and then sprays a stream of "drying gas such as air" on the wafers. The patent specification indicates that in its preferred embodiment, the equipment draws the wafers out of the wash liquid at a speed of 1.5 to 4.2 centimeters per minute. Neitzel calculated this to be equivalent to .59 to 1.7 inches per minute.

#### e. Neitzel's conclusion

After describing each of the patents discussed above, Neitzel concluded that a person of ordinary skill in the art at the time that CFMT filed the '761 application would have found the method disclosed in the '761 patent obvious in light of the prior art. He explained that the slow rate of wafer ascent and the use of surface tension for drying disclosed in the '761 patent was also disclosed in the Mehta, Steck, Coberly, and Kishida patents. He further explained that the use of IPA was disclosed in the Full Flow 1986 brochure and in the '532 patent, and that the Mehta patent referred to IPA dryers.

#### 3. Unenforceability

On its defense that CFMT engaged in inequitable conduct, Steag called Eugene Rzucidlo to the stand to explain PTO procedures to the jury. Rzucidlo worked in the PTO from 1970 to 1985, and has worked as a patent attorney since 1985. He explained that during the prosecution of the '761 patent, CFMT did not present the patent examiner with a copy of the 1986 Full Flow brochure, the *Semiconductor International* advertisement from February of 1987, the CFMT press release from late 1986 announcing CFMT's relationship with Rodel, or any documents referring to the transaction with TI in December, 1986. On cross, Rzucidlo admitted that the patent examiner was aware of the '532 patent during the patent prosecution. When Rzucidlo testified on direct that the '532 patent was not prior art to the '761, the court sustained CFMT's objection, and instructed the jury to disregard that testimony.

#### 4. Willfulness

CFMT argued at trial that Steag not only infringes the '761 patent, but that the infringement is willful. CFMT presented evidence at trial as to how Steag learned about the '761 patent, how Steag investigated the possibility that the Marangoni dryer might infringe the '761 patent, and what Steag did after learning about and analyzing the patent.

CFMT read portions from the deposition testimony of Dana Scranton, a former Steag employee. While working at Steag in late 1994, Scranton heard a rumor that CFMT was preparing to sue Steag for infringement of a patent it owned. Scranton testified that he told Brinkmann, who was then the controller of Steag and is now its president, about the rumors he had heard. Scranton asked George Stradar, an attorney for Steag, to find copies of CFMT's patents and to send copies to Scranton. Stradar in turn called Charles Mueller, a patent attorney, to find the CFMT patents. In a December 5, 1994 letter from Stradar to Scranton, Stradar indicates that he is sending the CFMT patents to Scranton. Stradar also informs Scranton that he only authorized Mueller to find the patents, but not so spend time analyzing them.

Scranton testified that he looked at the CFMT patents, chose the '761 patent as most relevant to Steag's products, and read it. Scranton testified that he discussed it with Brinkmann, but told him that there "doesn't seem to be any concern that there's an infringement." In March or April of 1995, Scranton heard another rumor that CFMT was preparing to sue, and then "decided it was not prudent to trust my judgment, but rather [decided] to seek expert counsel." Scranton wrote a letter to Stradar, dated April 25, 1995, indicating that Brinkmann had authorized him to tell Mueller to study the CFMT patents and to render an opinion on whether Steag infringes.

On the same day, April 25, 1995, Mueller wrote a letter back to Scranton asking for information on the Steag process that he needed in order to render an opinion on infringement. On June 1, 1995, Mueller wrote to Scranton again, asking for this same information. On June 2, Scranton sent Mueller the requested information. On June 28, 1995, Mueller sent a letter to Stradar, enclosing his letter opinion stating that in his opinion the Steag process does not infringe the claims in the '761 patent and the other 11 CFMT patents that he had studied. Mueller opines that the Steag process does not infringe the '761 patent because the Steag dryer lifts wafers through the liquid-vapor interface, while in the '761 patent "moving or handling of wafers is not required, and the structure of the vessel ... would not allow any wafer movement or handling." Steag continued to sell and market Marangoni dryers.

### 5. Damages

Both sides offered expert testimony on the damages that the jury should award if it determined that Steag's dryer infringes, that the claims of the '761 patent are valid, and that the patent is enforceable. Russell Parr testified for CFMT. Parr received an M.B.A. from Rutgers University in 1980. He testified that a hypothetical negotiation between CFMT and Steag, at the time that Steag began selling its Marangoni dryers, would have resulted in CFMT charging Steag a royalty rate of 9%, and that CFMT would have expected this rate to be applied to the total sales revenues that Steag received from sale of stand-alone Marangoni dryers, as well as sales of full "wet benches" (wet processing equipment that includes a Marangoni dryer as one of its components). He explained that CFMT would have believed that each sale of a Steag wet bench with the Marangoni dryer would mean that CFMT had lost a potential sale for the entire Full Flow system. Parr calculated the damages due to CFMT as $9.9 million.

For Steag, David Urey testified. Urey graduated from George Washington University with a law degree in 1964. He worked for eighteen years for U.S. Steel, recently renamed USX Corporation, as a patent and licensing attorney. Urey testified that, in his opinion, the reasonable royalty that would have resulted from the hypothetical negotiation between CFMT and Steag would have been about 1 to 2%. Urey testified that the royalty rate should only be applied to sales revenues for stand-alone dryers, and the Marangoni dryer component of the wet bench, since those are the actual devices in which drying takes place. He calculated the maximum damages that CFMT should receive to be about $414,000.

At trial, Steag's sales numbers from the sale of Marangoni dryer became a point of dispute between the parties. After Parr tes-

tified for CFMT as to his calculations of Steag sales, which he determined from sales sheets that Steag had produced during discovery, Steag called Brinkmann to the stand. Brinkmann testified that Parr had incorrectly calculated Steag's sales totals, because he misunderstood the Steag sales sheets and had double-counted some Steag sales. CFMT objected to Brinkmann's testimony, and argued that Steag had not produced sufficient information for CFMT to calculate sales, and furthermore had improperly failed to notify CFMT about Parr's double-counting before trial. The court ordered the parties to draft a jury instruction that used CFMT's sales revenues number, and stated that the court would reduce this number, if necessary, as a matter of post-trial relief. The parties drafted a jury instruction, and the court read it to the jury at the close of evidence. The court instructed the jury that if it found that damages should be awarded, and that the reasonable royalty rate should be applied to sales of stand-alone dryers and the Marangoni dryer component of the full wet bench, the sales revenues are $20,700,000. If the jury found the reasonable royalty rate should be applied to sales of the stand-alone dryers and the full wet bench, the sales revenues are $110,140,282.

### 6. The Jury's Verdict

At trial, along with the issues of infringement and validity, the court submitted the question of whether CFMT had engaged in inequitable conduct to the jury. However, the court indicated to the parties that it would treat the jury's verdict on the issue of unenforceability as an advisory verdict, and that the court would ultimately resolve the issue.

On December 12, 1997, the jury returned its verdict. The jury found that operation of Steag's Marangoni dryer literally infringes claims 1, 8, 17, and 22 of the '761 patent. The jury also found that the Marangoni dryer infringes each element of each of the asserted claims under the doctrine of equivalents. The jury found that Steag has actively induced users of the Marangoni dryer to infringe, and that Steag has contributorily infringed, the asserted claims. The jury re-

jected Steag's contentions that the claims of the '761 patent are invalid and that the patent is unenforceable. The jury awarded CFMT $3,105,000, and indicated that it used a royalty rate of 15% to arrive at the damages amount. Finally, the jury found that Steag's infringement of the '761 patent was willful.

On December 15, 1997, the court wrote to counsel for both parties. The court indicated that it would delay entering an order directing the clerk to enter judgment for CFMT, since the court still needed to resolve the issue of unenforceability, and the amount of damages owed by Steag was still subject to revision upon post-trial motion. The court stated that it would refrain from ordering the clerk to enter judgment until it had resolved post-trial motions.

### L. Post–Trial Motions

At the close of CFMT's evidence, at the close of its own evidence, and again after CFMT's rebuttal case, Steag moved for judgment as a matter of law on the issues of infringement, invalidity, and unenforceability. On December 26, 1997, Steag renewed its motion, and moved in the alternative for a new trial.

On December 29, 1997, CFMT moved for the court to award treble damages pursuant to its authority under 35 U.S.C. § 284, and to award attorney's fees pursuant to its authority under 35 U.S.C. § 285.

## II. DISCUSSION

### A. What is the Standard For Granting Judgment as a Matter of Law?

Federal Rule of Civil Procedure 50(a) provides that the court may determine an issue against a party where "there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." See also Gomez v. Allegheny Health Servs. Inc., 71 F.3d 1079, 1083 (3d Cir.1995), cert. denied, 518 U.S. 1005, 116 S.Ct. 2524, 135 L.Ed.2d 1049 (1996) (describing standard as "whether there is evidence upon which a reasonable jury could properly have found its verdict"). Rule 50(b) provides that "[i]f, for any reason, the court does not grant a motion

for judgment as a matter of law made at the close of all the evidence, the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion." Rule 50(b) also requires that the movant actually renew its request for judgment as a matter of law within 10 days of the entry of judgment.

■ When a party chooses to renew its motion and challenge a jury's verdict, the court must assess the sufficiency of the evidence supporting the verdict. In performing this assessment, the court must draw all reasonable inferences from the evidence in the light most favorable to the non-movant. *Perkin–Elmer Corp. v. Computervision Corp.*, 732 F.2d 888, 893 (Fed.Cir.), *cert. denied*, 469 U.S. 857, 105 S.Ct. 187, 83 L.Ed.2d 120 (1984); *Richardson–Vicks Inc. v. Upjohn Co.*, 122 F.3d 1476, 1479 (Fed.Cir.1997); *Gomez*, 71 F.3d at 1083. The court may not determine the credibility of witnesses, and it may not "substitute its choice for that of the jury between conflicting elements of the evidence." *Perkin–Elmer*, 732 F.2d at 893.

B. *Did the Jury Properly Find That Steag Literally Infringes the Asserted Claims of the '761 Patent?*

1. *How must the court determine whether CFMT sufficiently established infringement?*

■ To determine whether Steag is entitled to judgment as a matter of law on the issue of literal infringement, the court must first construe the claims of the patent, and then must compare the claims to the accused device. *See Texas Instruments Inc. v. United States Int'l Trade Comm'n*, 988 F.2d 1165, 1171 (Fed.Cir.1993). In this comparison the court must first determine if all the claim elements, as construed, are present in the device. *Id.*

2. *Does Steag's process use a "drying vapor"?*

Steag argues that no reasonable jury could conclude from the evidence that its process uses a "drying vapor," as required in each of the asserted claims. The court defined drying vapor in its claim construction opinion to mean "a vapor that facilitates the removal of liquid from a surface." Steag argues that the court should reject the jury's finding that use of the Steag dryer literally infringes the claims of the '761 patent, and grant judgment as a matter of law for Steag.

Steag's Marangoni dryer uses a mixture that is 2.5% IPA and 97.5% nitrogen. Steag points out that the '761 patent specification teaches that nitrogen gas is a foreign gas that should be excluded from the system, and contends that this precludes a jury from finding that Steag's process uses a drying vapor. Steag also points to the testimony of its expert, An–Ti Chai, who testified that the IPA vapor used in the Steag process does not facilitate drying, but simply induces the Marangoni flow.

CFMT counters that Steag's process clearly uses IPA vapor, and that there was an abundance of evidence that this vapor "facilitated" the drying process. Helms testified for CFMT that the IPA vapor in the Steag process is a drying vapor, and creates a "chemical squeegee" effect on the wafer surface. In fact, even Chai's testimony supports CFMT's position. He did not testify that the IPA vapor prevented drying—he stated that the IPA induced a Marangoni flow, and admitted that the Marangoni dryer would not work without this IPA vapor. Thus, despite his testimony to the contrary, he essentially admitted that the IPA vapor facilitates drying. Chai disputed Helms's explanation of *why* the Steag dryer works but not *whether* it works. Since the parties' experts agree that the IPA vapor in Steag's dryer facilitates drying, the court finds that the dryer uses a drying vapor.

3. *Does Steag's process "directly displace" rinsing fluid with drying vapor?*

Steag next argues that no reasonable jury could conclude that the Marangoni dryer involves a process where drying vapor "directly displaces" rinsing fluid, as required in the asserted claims. The court defined "directly displacing" in its claim construction opinion to mean "replacing with no intervening substance."

Steag offers three arguments to support its claim that its process does not involve direct displacement. First, it argues that the

Marangoni dryer actually lifts the wafers during drying, while the '761 process calls for the wafers to stay stable. Steag argues that the drying vapor and the rinsing fluid do not actually change locations. Instead, Steag claims that as the wafer moves out of the rinse bath, rinsing fluid takes the place that used to be taken by the wafer, and the wafer takes the place that used to be taken by drying vapor. Thus, the only "displacement" is fluid for solid and solid for vapor. Second, Steag argues that as the IPA vapor contacts the rinsing fluid, a layer of IPA condenses into liquid form on the surface of the rinsing fluid. Thus, Steag argues that even if one were to consider displacement from the perspective of the wafer, each portion of the wafer first has rinsing fluid displaced by IPA liquid, and then IPA liquid is displaced by the IPA vapor. Again, Steag argues, there is no direct displacement of rinsing fluid by drying vapor—there is an intermediate step involving IPA liquid. Finally, Steag argues that its process does not use direct displacement, because the vapor in the Steag system does not push the water from the wafer surfaces. Steag argues that its system dries through the Marangoni effect, and that this is not the same as direct displacement.

At trial, Chai testified for Steag that the Marangoni dryer does not use direct displacement, but instead uses the Marangoni effect to dry. He also testified that the rinsing fluid is not displaced by drying vapor in the Steag process, because it is the wafer that moves and not the rinsing fluid/drying vapor interface.

CFMT responds by quoting from claim 1, which calls for direct displacement of the rinsing fluid "from said surfaces." It argues that the direct displacement step must be understood from the perspective of the wafer surface, and that therefore it does not matter whether the wafer remains in one place and the rinsing fluid/drying vapor interface moves (as it does in the Full Flow process when the rinsing fluid drains from below) or the wafer moves and the interface remains in one place (as it does in the Marangoni dryer). CFMT also refutes the argument that the existence of a layer of IPA liquid at the rinsing fluid/drying vapor interface means

that there is no infringement. In fact, CFMT points out, the specification for the '761 patent expressly mentions the possibility that this liquid layer might form. Furthermore, McConnell testified for CFMT that the liquid IPA layer makes the drying process more "robust."

The court can dispense with the first dispute quickly. During claim construction, Steag argued that the term "suspended in a rinsing fluid" in claim 1 required that the wafers be held in a fixed position. The court disagreed, and pointed out that claim 19 specifically limited claim 1 by claiming a "method according to claim 1 which does not require movement or handling of said surfaces between rinsing and drying steps." Steag now attempts to argue that the direct displacement requirement in claim 1 also means that the wafers must be held in a fixed position. The court again disagrees. In fact, the court specifically instructed the jury that "[t]he term 'directly displacing' as used in Claim 1 of the '761 patent means: Replacing with no intervening substance and is not limited to a descending level of rinsing fluid."

As for the second dispute, both sides agree that a layer of IPA liquid forms on the surface of the rinsing fluid in Steag's process. The parties appear to dispute whether this IPA liquid is an "intervening substance." If it is an intervening substance, then drying vapor does not directly displace rinsing fluid. Steag raised this same argument during claim construction. The court found that Steag did not seek further definition of any of the terms in the patent, but rather wanted a ruling that the presence of a liquid layer in its process means it does not infringe. The court declined to address the issue at that time, as it was not a claim construction issue.

As mentioned above, CFMT disclosed in its patent specification that the '761 process often· includes a layer of IPA liquid. CFMT's own machine uses a process that includes such a layer. McConnell testified that the warmer drying vapor condenses as it strikes the cooler wafer chamber and cooler rinsing fluid. He testified that this condensation was the natural result of the difference in temperature. It appears that the liquid layer might even improve the drying process.

From the evidence presented, the jury could reasonably conclude that the IPA vapor displaces rinsing fluid, and that part of this process involves the formation of a liquid layer in the interface. While this IPA liquid might be in a different phase than the IPA vapor, the jury could reasonably find that it is not an intervening substance. In other words, the jury could reasonably conclude that the forming of an IPA liquid layer is simply one step in the displacement of rinsing fluid with drying vapor.

After the close of briefing on the post-trial motions, Steag submitted to the court several documents that CFMT had filed in its prosecution of the Japanese counterpart to the '761 patent. In the Japanese proceeding, CFMT amended claim 1 so that it claims an extra step of forming a liquid layer of drying fluid on top of the rinsing fluid, and then having the drying "fluid" directly displace the rinsing fluid. Steag claims that this is an admission by CFMT that a process that allows the presence of a liquid layer is different than the process disclosed in the '761 patent.

However, CFMT's choice to further describe its process in the claims of its Japanese patent is irrelevant to the matters litigated in this court. Here, the jury found that Steag's process infringes despite the presence of an IPA liquid layer. The court finds that this conclusion is reasonable.

Finally, Steag argues that its system dries using the Marangoni effect, and not using direct displacement. Steag appears to rely upon a passage in the '761 specification that states that "it is believed that the method of the invention involves a physical pushing by the vapor or pulling by the liquid surface, resulting in direct displacement by vapor for liquid."

However, both Helms and Raghavan testified for CFMT that Steag's dryer uses direct displacement, regardless of the force that drives the drying process. The court's construction of the term did not include an element of pushing or pulling, but instead defined it to mean "replacing." The jury could reasonably have found that this replacing does occur, and that the use or nonuse of the Marangoni effect in the Steag process is

irrelevant to the issue of whether the process uses direct displacement.

The court finds that there was sufficient evidence for the jury to reasonably find that the Steag process literally infringes the asserted claims in the '761 patent. Thus, the court will deny Steag's motion for judgment as a matter of law on the issue of literal infringement.

C. *Did the Jury Properly Find That Steag Infringes the Asserted Claims of the '761 Patent Under the Doctrine of Equivalents?*

*1. What constitutes infringement under the doctrine of equivalents?*

██ An accused product "that does not literally infringe upon the express terms of the patent claim may nonetheless be found to infringe if there is 'equivalence' between the elements of the accused product ... and the claimed elements of the patented invention." *Warner–Jenkinson Co., Inc. v. Hilton Davis Chemical Co.,* 520 U.S. 17, 117 S.Ct. 1040, 1045, 137 L.Ed.2d 146 (1997). Courts have described the "doctrine of equivalents" inquiry in several ways. The Supreme Court has suggested that the issue is "whether under the circumstances the [substitution of one element for another] was so insubstantial that" the doctrine should apply. *Graver Tank & Mfg. Co. v. Linde Air Products Co.,* 339 U.S. 605, 610, 70 S.Ct. 854, 94 L.Ed. 1097 (1950). It has also described the inquiry as whether the accused product "performs substantially the same function in substantially the same way to obtain the same result." *Union Paper–Bag Machine Co. v. Murphy,* 97 U.S. 120, 125, 24 L.Ed. 935 (1877). In *Warner–Jenkinson,* 117 S.Ct. at 1054, the Court indicated that the "particular linguistic framework used" is not important, so long as it addresses the "essential inquiry [of whether] the accused product or process contain[s] elements identical or equivalent to each claimed element of the patented invention." The Court emphasized that "[t]he determination of equivalence should be applied as an objective inquiry on an element-by-element basis." *Id.* The question of equivalence appears to be one for the jury. *See Id.* at 1053

(indicating that Federal Circuit's holding in the case that equivalence was a jury question has "ample support" in prior cases, and noting that nothing in another recent Supreme Court patent decision "necessitates a different result," but finding it unnecessary to resolve the issue).

*2. Did CFMT produce sufficient evidence at trial to support the jury's verdict that Steag infringes under the doctrine of equivalents?*

■ Steag argues that CFMT failed to produce any evidence at trial to support a finding that it infringes the asserted claims of the '761 patent under the doctrine of equivalents. Steag claims that CFMT needed to present comparative testimony on Steag's dryer for each element of the asserted claims, and also to offer "particularized testimony and linking argument" establishing that the differences between the Steag's drying method and the '761 method are insubstantial. Steag claims that CFMT failed to offer such proof, and thus that Steag is entitled to judgment as a matter of law on this issue.

Steag focuses on CFMT's failure to formally present evidence establishing infringement under the doctrine of equivalents, separate and distinct from its evidence establishing literal infringement. Steag relies on *Lear Siegler, Inc. v. Sealy Mattress Co.*, 873 F.2d 1422, 1425 (Fed.Cir.1989), in which the Court of Appeals for the Federal Circuit declared that the "evidence and argument on the doctrine of equivalents cannot merely be subsumed in plaintiff's case of literal infringement." The Court also explained that a party wishing to prove infringement under the doctrine of equivalents needs to provide "particularized testimony and linking argument" on a "limitation-by-limitation basis." *Id.* at 1426.

Steag argues that CFMT's two experts, Helms and Raghavan, only offered opinions on literal infringement. Helms, for instance, went through each element of the asserted claims, and when asked whether that element appeared in Steag's process frequently answered "Absolutely." CFMT answers that it did present testimony that Steag's process is equivalent. For instance, Helms discussed the significance of the wafer moving instead of remaining in a fixed position, and also discussed Steag's use of nitrogen as a carrier gas for the IPA vapor. Helms testified that "whether you move the liquid past the wafer or have a stationary liquid and move the wafer ... [i]tis exactly the same physics, same chemistry, same process." He also testified that Steag's nitrogen gas "really serves no purpose." In addition, both Helms and Raghavan testified about their understanding of each element of the asserted claims, and explained why they believed Steag's drying method includes these elements.

It seems anomolous to find that CFMT presented sufficient evidence to establish that Steag's process contains each and every element of the asserted claims literally, and yet failed to present sufficient evidence to establish that Steag's process contains each element equivalently. In fact, CFMT appears to have provided enough factual evidence to support the jury's verdict that Steag's process infringes under the doctrine of equivalents.

However, the Federal Circuit appears to require plaintiffs to provide something more in order to satisfy their burden of proof. In *Lear Siegler*, 873 F.2d at 1426, for example, the Federal Circuit reversed the district court's finding of infringement under the doctrine of equivalents. Judge Michel, writing for the court, noted that plaintiff had not presented any "testimony reasonably served to articulate the comparison" between the patent's claims and the accused device. Michel suggested that, even if plaintiff presented "adequate testimony on substantial identity of function, means, and result," without any comparative testimony the "jury is more or less put to sea without guiding charts." *Id.* at 1425–26. Similarly, in *Malta v. Schulmerich Carillons, Inc.*, 952 F.2d 1320 (Fed.Cir.1991), *cert. denied*, 504 U.S. 974, 112 S.Ct. 2942, 119 L.Ed.2d 566 (1992), the Federal Circuit affirmed the district court's grant of judgment notwithstanding the verdict, where the jury had found infringement under the doctrine of equivalents. Judge Rich wrote for the court, and noted that

plaintiff had failed to provide "testimony that is a sufficient explanation of ... why the overall function, way, and result of the accused device are substantially the same as those of the claimed device." *Id.* at 1327. Judge Michel concurred, and explained that while plaintiff "may have briefly implied that the way was also essentially the same, the jury certainly was not told how and why that was so." *Id.* at 1329–30; *see also Texas Instruments Inc. v. Cypress Semiconductor Corp.,* 90 F.3d 1558, 1566–68 (Fed.Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 1818, 137 L.Ed.2d 1027 (1997) (affirming district court's grant of judgment as a matter of law on the issue of infringement under the doctrine of equivalents to defendant, explaining that plaintiff had not satisfied *Lear Siegler*'s requirement that there be "particularized testimony and linking argument" when one expert spent the "overwhelming majority" of his time addressing literal infringement, and a second expert only testified as to the doctrine of equivalents "in conclusive fashion").

In the present case, CFMT's experts did not spend any time discussing how or why they believed the Marangoni dryer performs any steps of the patented process in a way that is substantially the same. In addition, CFMT did not spend much time arguing infringement under this theory to the jury. In closing argument, CFMT's counsel only referred to the doctrine briefly. He suggested the jury would find that any differences between Steag's system and the patented process are insubstantial, but reiterated that "CFM certainly contends that there are [no differences]."

The court does not believe that there should be a strict formula for evidence needed to support a case alleging infringement under the doctrine of equivalents. *See National Presto Indus., Inc. v. West Bend Co.,* 76 F.3d 1185, 1191 (Fed.Cir.1996) (noting that "proof of equivalency is not a matter of formula"). However, it appears that CFMT presented little, if any, "particularized testimony and linking argument" on the issue. Instead, CFMT chose to focus its efforts on a theory of literal infringement, and CFMT prevailed on that theory. While CFMT might have altered its presentation so as to satisfy its burden under the doctrine of equivalents, using many of the same facts, the court finds on the record before it that CFMT did not present sufficient evidence to support the jury's verdict on the issue. Thus, the court will grant Steag's motion for judgment as a matter of law on the issue of infringement under the doctrine of equivalents.

**D. Did the Jury Properly Find That Steag Induces Infringement and Contributorily Infringes the '761 Patent?**

*1. What conduct constitutes inducing infringement or contributory infringement?*

■ 35 U.S.C. § 271(b) provides that "[w]hoever actively induces infringement of a patent by another shall be liable as an infringer." Subsection (c) defines contributory infringement to be where a person "offers to sell or sells ... a component of a patented machine ... or a material or apparatus for use in a patented process, constituting a material part of the invention." Subsection (c) also requires that the person know that the machine or apparatus sold be "especially made or especially adapted for use in an infringement ... and not ... suitable for substantial noninfringing use."

*2. Did CFMT present sufficient evidence for the jury to find that Steag induces infringement and contributorily infringes the '761 patent?*

The jury found that Steag induces infringement and contributorily infringes the '761 patent. CFMT argued at trial that Steag induces and contributes to infringement through its marketing practices with its customers. Steag argues that CFMT failed to produce evidence of what drying processes Steag's customers actually practice. Steag claims that CFMT only showed that Steag sold its dryers to such companies as Micron, IBM, and SGS Thomson. Steag points out that while both Raghavan and Helms witnessed the use of Marangoni dryers at unspecified locations, neither was able to see inside the machine to determine if the actual process performed in that machine was infringing. Finally, Steag argues that even if CFMT proved that a process carried out

according to Steag's brochures, manuals, and video presentation infringes, CFMT did not prove that any particular customer carried out the drying process in that way, and did not prove that these materials were ever shown or distributed to customers.

CFMT counters that it produced substantial circumstantial evidence of Steag's inducement and contributory infringement. First, CFMT introduced Steag's financial reports that reveal millions of dollars in sales of equipment using the Marangoni drying process. Second, CFMT presented Steag's manuals for the Marangoni dryer, which show that the dryer is shipped out to customers with preset factory settings for such things as speed of wafer ascent. Third, Steag's promotional video instructs customers about optimal wafer ascent rates.

Steag cites *Joy Technologies, Inc. v. Flakt, Inc.*, 6 F.3d 770, 775 (Fed.Cir.1993), for the proposition that plaintiff must prove more than the fact that equipment was sold in order to carry its burden showing inducement. However, CFMT did produce evidence of more than just a sale. Here, CFMT showed that Steag's Marangoni dryer infringes the '761 process, that Steag sold the dryer to other companies, and that Steag produced manuals and preset the dryer so that customers were instructed to use the dryer in a way that infringes. Steag did not present any evidence that customers use the Marangoni dryer in some non-infringing way. Thus, the court find there was sufficient evidence for the jury to conclude that CFMT showed by a preponderance of the evidence that Steag has induced users of the Marangoni dryer to infringe, and has contributorily infringed, the '761 patent. The court will deny Steag's motion for judgment as a matter of law on this issue.

**E. Did the Jury Properly Find That Steag Willfully Infringed the '761 Patent?**

*1. What is the standard for establishing willful infringement?*

 35 U.S.C. § 284 authorizes the court to "increase the damages up to three times the amount found or assessed."

Courts exercise their authority to increase damages where defendant infringes "willfully." *See, e.g., Johns Hopkins Univ. v. Cell-Pro*, 978 F.Supp. 184 (D.Del.1997). In the willfulness inquiry, "the primary consideration is whether the infringer, acting in good faith and upon due inquiry, had sound reason to believe that it had the right to act in the manner that was found to be infringing." *SRI Int'l, Inc. v. Advanced Technology Laboratories, Inc.*, 127 F.3d 1462, 1464–65 (Fed. Cir.1997). Willfulness is a "question of fact." *Id.* at 1465. The fact finder should resolve the issue "by evaluating the totality of the surrounding circumstances." *Ortho Pharmaceutical Corp. v. Smith*, 959 F.2d 936, 944 (Fed.Cir.1992).

 When a potential infringer "has actual notice of a patentee's rights, the infringer has an affirmative duty of care." *Id.* One factor to consider in the willfulness inquiry is whether the potential infringer obtains and follows competent legal advice after having knowledge of the patent. *See SRI Int'l*, 127 F.3d at 1465. However, the mere fact that a party obtains a legal opinion does not preclude a finding that the party acted willfully. *See Johns Hopkins*, 978 F.Supp. at 193 (finding defendant willfully infringed when it relied on an attorney's opinion that was "obviously deficient"); *see also Ortho Pharmaceutical*, 959 F.2d at 944 (noting that "counsel's opinion must be thorough enough . . . to instill a belief in the infringer that a court might reasonably hold the patent is invalid, not infringed, or unenforceable"). Whether infringement was willful will depend on the reasonableness of the party relying on that legal opinion. *See Id.*

*2. Did CFMT present sufficient evidence to support the jury's verdict that Steag's infringement was willful?*

 CFMT bore the burden of proving willfulness by clear and convincing evidence. *See Gustafson, Inc. v. Intersystems Indus. Prod., Inc.*, 897 F.2d 508, 510 (Fed. Cir.1990). Steag argues that CFMT failed to meet its burden at trial. Steag admits that it knew of the '761 patent as of November 1994. In fact, Scranton considered it to be the most "relevant" of the 12 CFMT patents he looked

at in late 1994. The jury found that Steag infringes, and the court has found that verdict to be supported by sufficient evidence. Thus, the only question left in the willfulness inquiry is whether Steag had "sound reason" for continuing to sell the Marangoni dryer after learning of the CFMT patent. That is, the court must determine whether CFMT presented sufficient evidence for the jury to reject Steag's claim that it had a good faith reason to believe its process did not infringe.

The facts relevant to willfulness are relatively simple. First, Scranton, a Steag engineer, heard a rumor about the patent in November 1994. He requested copies of the CFMT patents from a Steag attorney (Stradar) and then looked at the patents. Scranton apparently decided that the '761 patent was most relevant to Steag's product. However, he decided that the Marangoni dryer was not covered by the '761 patent. Next, Scranton heard another rumor in April 1995. He discussed it with others at Steag, and Steag requested a formal opinion on infringement from Mueller, an experienced patent attorney. Mueller found that the Marangoni dryer does not infringe, and wrote a letter stating this opinion on June 30, 1995. Mueller discussed his opinion with Stradar and Scranton. When Brinkmann became president of Steag in July, 1995, he received a copy and "skimmed" it. Steag claims that it was justified in believing it did not infringe, based on Scranton's analysis of CFMT's patents and Mueller's opinion letter.

CFMT complains that Steag never altered its drying process after hearing about CFMT's patent, and continued to aggressively market and sell the Marangoni dryer after learning about the patent. CFMT points out that Steag did not attempt to obtain a legal opinion on infringement until five months after first hearing about the patent, and that Scranton failed to give Mueller the information he needed to complete his opinion for five weeks after Steag requested the opinion.

Moreover, CFMT argues that Mueller's opinion was insufficient. CFMT points out that Mueller never read the file history for the '761 patent, and that he addresses 12 different CFMT patents in his 26–page letter, only 4 pages of which focus on the '761

patent. Moreover, of the 4 pages dedicated to the '761 patent, three of them do nothing more than summarize the invention disclosed in the patent. CFMT points out that Mueller spent less than 40 hours preparing his opinion, and that he does not address the issues of validity or unenforceability. His sole reason for concluding that the Marangoni dryer does not infringe claim 1 of the '761 patent is that the wafers move in the Marangoni dryer, but in the '761 patent specification it states that the system "requires no movement or handling of the wafers between the rinsing and drying." Finally, CFMT claims that Brinkmann should have read Mueller's opinion more carefully, instead of "skimming" it and only worrying about its "bottom line."

From the evidence presented, the jury could reasonably conclude that Steag did not have a good faith reason for believing it did not infringe. Steag knew about CFMT's patent, but failed to seek legal advice until it appeared CFMT was prepared to sue. Steag then received a legal opinion that offered little substantive analysis of the patents and the possibility of infringement. The jury's verdict reflects its determination about Steag's intent—a determination that depends in large part upon the perceived credibility of witnesses, and thus one specifically suited for juries. The court finds that there was sufficient evidence for a jury to conclude that Steag's infringement was willful. Thus, the court will deny Steag's motion for judgment as a matter of law on this issue.

*3. Should Steag be punished for its willful infringement with a judgment for more than CFMT's actual damages?*

■ CFMT moves for an award of treble damages, pursuant to this court's authority under 35 U.S.C. § 284, which provides that the court may "increase damages up to three times the amount found or assessed." The statute does not set out the standards the trial court should apply in deciding whether or not to increase damages. However, the Court of Appeals for the Federal Circuit has described the inquiry as "whether the infringer, when it knew of the other's patent protection, investigated the scope of the patent and formed a good-faith belief that it was

invalid or that it was not infringed." *Stryker Corp. v. Intermedics Orthopedics, Inc.*, 96 F.3d 1409, 1414 (Fed.Cir.1996).

The Federal Circuit has listed "deliberate copying" as a factor to consider in the determination of enhanced damages. *L.A. Gear, Inc. v. Thom McAn Shoe Co.*, 988 F.2d 1117, 1126 (Fed.Cir.), *cert. denied*, 510 U.S. 908, 114 S.Ct. 291, 126 L.Ed.2d 240 (1993). McConnell testified at trial that the listed inventor on the Phillips European patent, J.J. Van Oekel, visited CFMT about a year and a half before Phillips filed for its patent. CFMT suggests that this is proof that Phillips stole CFMT's idea for a drying process, and thus that the Marangoni dryer that uses the ideas in the Phillips patent was copied from CFMT's dryer. However, even if CFMT showed that Van Oekel copied CFMT's process, it has not shown that this is reason to punish Steag. Steag merely licenses the technology from Phillips, and CFMT did not present any evidence at trial that any Steag employee or officer knew about Van Oekel's visit to CFMT, or had even met Van Oekel. Thus, the court does not agree that this factor weighs in favor of enhanced damages.

CFMT does not allege any other circumstance that convinces the court that some amount of punitive damages would be appropriate here. Scranton investigated CFMT's patents when he first heard of them. Steag eventually sought a legal opinion on infringement. Admittedly, this opinion was inadequate, and does not shield Steag from a finding of willful infringement. But when considering whether to enhance damages, the real issue is whether Steag made a decision to continue selling its dryers that was so reckless that it should be punished. CFMT did not produce any evidence that Steag's officers had reason to doubt the infringement opinion. Stradar testified for Steag that he "trusted [patent counsel]. And if they, as experienced patent lawyers, said that this is the way it is, I mean, I believe it. I depend on it." Moreover, Scranton made some effort to investigate CFMT's patents when he asked for copies of them from counsel and read through them. While the court does not find that Steag's actions preclude a finding of willfulness, it also does not find that they deserve additional punishment. Thus, the court will deny CFMT's motion for treble damages and to declare this case exceptional.

### F. Did the Jury Properly Find That the Claims of the '761 Patent Are Not Anticipated?

 Pursuant to 35 U.S.C. § 102, a patent claim is invalid for anticipation if it was "described in a printed publication in this or a foreign country ... more than one year prior to the date of the application for patent." To establish invalidity under an anticipation theory, Steag must show that every element of the patent claim was contained in a single prior art reference. *See Hybritech Inc. v. Monoclonal Antibodies, Inc.*, 802 F.2d 1367, 1379 (Fed.Cir.), *cert. denied*, 480 U.S. 947, 107 S.Ct. 1606, 94 L.Ed.2d 792 (1987). This prior art reference must enable one of ordinary skill in the art to practice the invention. *See Beckman Instruments, Inc. v. LKB Produkter AB*, 892 F.2d 1547, 1551 (Fed.Cir.1989).

Steag claims that the '761 patent is invalid, because it was anticipated by CFMT's 1986 Full Flow brochure. The brochure was published sometime in 1986, and was thus published more than one year prior to the date of CFMT's application on April 20, 1988. The brochure describes a method for drying wafers, where "filtered IPA vapor is introduced to the top of the wafer vessel and a drain is opened out the bottom." After the water is drained, "instead of a water film remaining on the wafers, an IPA film remains." The brochure explains that "[w]hen all of the water has been displaced from the vessel, warm, filtered nitrogen is used to purge out the remaining IPA vapors." The brochure claims that the system reduces particle generation, streaking or staining, and that it offers "very fast drying." It describes the wafers as coming out "bone-dry" and having "exceptionally low particle counts." Neitzel testified for Steag that this description discloses each and every element of claims 1, 8, 17, and 22 of the '761 patent.

CFMT counters that the 1986 brochure describes nothing more than the chemical drying process it used before it had ever

invented the direct displacement technique it discloses in the '761 patent. McConnell and Walter, the co-inventors, each testified that they came up with the idea for direct displacement in the summer of 1987—after they published the brochure. Each also testified about the changes they made in the drying process in the Full Flow equipment, and described the differences between direct displacement drying and the drying technique described in the 1986 brochure. For instance, they explained that they slowed the draining rate down in direct displacement. They also each testified that the drying technique described in the 1986 brochure is also described in the '532 patent, which was presented to the patent examiner during the prosecution of the '761 patent.

CFMT argues that the language in the 1986 brochure makes it clear that it does not disclose the '761 drying method. First, CFMT claims that the brochure does not refer to direct displacement from the surfaces of the objects, but only mentions displacement "from the vessel." Second, the brochure mentions "very fast drying" and a drying time of three minutes. CFMT claims this correlates to a rate of water descent of 30 to 40 inches per minute, and that this is inconsistent with the "rate" limitation in the '761 patent, which is described in the specification as being somewhere between 1 and 4 inches per minute. Finally, CFMT argues that the brochure's claim that wafers emerge "bone dry" does not meet the '761's requirement that the wafers have "substantially no liquid droplets," after the rinsing fluid is drained. It explains that the brochure only speaks about "bone dry" wafers after the entire drying process (including the nitrogen purge at the end), and not the moment after the rinse water is drained.

CFMT mainly relies upon McConnell's and Walter's testimony that they developed the '761 process through experimentation in the summer of 1987. Steag argues that testimony about subsequent CFMT experiments is irrelevant to the anticipation inquiry. Steag cites *General Elec. Co. v. Watson,* 188 F.Supp. 341, 343 (D.D.C.1960), among other cases, for the proposition that "[t]he fact that the disclosure was made is all that is neces-

sary.... [E]ven an accidental disclosure, if clear, may constitute an anticipation."

However, CFMT presented sufficient evidence for the jury to conclude that the drying process described in the 1986 brochure was different from the '761 drying process, and that the description in the 1986 brochure did not "accidentally" disclose the '761 process. First, the jury could reasonably find that the direct displacement technique did not exist until after CFMT had published the 1986 brochure. Second, the jury could reasonably find that the brochure was not enabling, since even the writers of the brochure could not have performed the '761 process in 1986. Third, the jury could reasonably find that the brochure's references to "fast drying" and failure to disclose the "substantially no liquid droplets" limitation means that it does not anticipate the '761 patent. Thus, the court will deny Steag's motion for judgment as a matter of law on this issue.

### G. Did the Jury Properly Find That the Claims of the '761 Patent Are Not Invalid for Obviousness?

An inventor may not obtain a patent "if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which" the patent pertains. 35 U.S.C. § 103. Where the court must selectively combine prior art references in order to render an invention obvious, there must be some reason apparent from the prior art for combining those elements. *See Uniroyal, Inc. v. Rudkin–Wiley Corp.,* 837 F.2d 1044, 1051 (Fed.Cir.), *cert. denied,* 488 U.S. 825, 109 S.Ct. 75, 102 L.Ed.2d 51 (1988). Pursuant to 35 U.S.C. § 282, a patent shall be presumed valid. That is, the PTO's issuance of a patent must be taken as an indication that the patent examiner assigned to the patent has determined that the subject matter is not obvious.

Several factual issues underlie the obviousness decision. These include: (1) the scope and content of the prior art; (2) the differences between the claimed invention and the prior art; (3) the level of ordi-

nary skill in the art; and (4) other objective indicia of nonobviousness. *See Graham v. John Deere Co.*, 383 U.S. 1, 17–18, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966); *Richardson–Vicks v. Upjohn Co.*, 122 F.3d 1476, 1479 (Fed.Cir.1997). This last category, secondary evidence of nonobviousness, can include evidence of commercial success. It is often quite helpful in the obviousness inquiry. *See Pro–Mold & Tool Co. v. Great Lakes Plastics, Inc.*, 75 F.3d 1568, 1573 (Fed.Cir.1996). However, to rely on commercial success to refute an obviousness assertion, the patent owner must show a nexus between the sales and the claimed invention. *See Pentec, Inc. v. Graphic Controls Corp.*, 776 F.2d 309, 315 (Fed.Cir.1985).

Steag must establish each fact underlying a determination of obviousness by clear and convincing evidence. *See Ashland Oil, Inc. v. Delta Resins & Refractories, Inc.*, 776 F.2d 281, 292 (Fed.Cir.1985), *cert. denied*, 475 U.S. 1017, 106 S.Ct. 1201, 89 L.Ed.2d 315 (1986). The ultimate conclusion of obviousness, however, is a question of law. *See Richardson–Vicks*, 122 F.3d at 1479.

Steag argues that, even if the asserted claims of the '761 patent are not anticipated, they were obvious to those skilled in the art at the time that CFMT applied for its patent in April 1988. To support its contention, Steag relies on CFMT's 1986 brochure, CFMT's February 1987 advertisements, CFMT's press release announcing its new relationship with Rodel, and four U.S. patents (Mehta, Steck, Coberly, and Kishida).

Steag first points out that the Mehta, Steck, Coberly, and Kishida patents each disclose a drying method that uses a controlled rate for withdrawing the wafers from the rinsing fluid. Steag claims that each patent suggests a rate of between 1 and 4 inches per minute, which is the range of speeds that the '761 specification describes as being "satisfactory." Steag next points out that the 1986 brochure and 1987 advertisements disclose the use of IPA vapor in a drying process. Steag claims that these prior art publications, taken together, suggest a method for drying objects that uses a slow, steady descent rate for the rinsing fluid, using IPA vapor. At trial, Neitzel testified

for Steag that, in light of all the prior art, the asserted claims in the '761 patent would be obvious to one of ordinary skill in the art on the date that CFMT filed its patent application.

CFMT counters that the 1986 brochure actually touted the rapidness of its drying method. CFMT claims that this focus on fast drying made the use of a "slow-pull" technique counterintuitive. CFMT also points out that Mehta, one of the patents that teaches a slow-pull technique, lists reasons to avoid using IPA for drying. Again, CFMT argues, this made the combination of slow pull and IPA vapor counterintuitive.

CFMT also claims that the slow-pull technique was considered ineffective. Helms testified that it "doesn't work at all." In the Philips European patent, Philips claimed that the slow-pull method used in the Steck patent leaves drying marks and residues that can be "disturbing." Thus, CFMT argues that it would not be obvious to combine the use of IPA vapor with a process that did not work well.

Next, CFMT claims that secondary indications of nonobviousness, such as the commercial success of the Full Flow machine, refute the assertions that the '761 drying method was obvious. CFMT points out that it has sold almost 200 Full Flow vessels, and that each one uses the '761 process. McConnell and Pam McCardell, a CFMT vice president, testified that the drying step was a critical step in the Full Flow process. McConnell described the '761 patent as the "crown jewel" of the company. McCardell also testified that *Semiconductor International* awarded the Full Flow its "Best Product" award in 1995.

Steag argues that Full Flow's commercial success is irrelevant to the obviousness of the '761 patent, because CFMT failed to show a nexus between this success and the patented drying process. Steag claims that any commercial success could be due to good marketing, or perhaps the cleaning abilities of the Full Flow machine. Steag also argues that the Full Flow machine does not use the patented process. Steag claims that since the IPA forms a liquid layer on top of the

rinsing fluid, the Full Flow process does not dry using direct displacement.

Taking Steag's second argument first, the court has already rejected the argument that the formation of a liquid IPA layer means that Steag's dryer does not infringe. For the same reasons, the court rejects Steag's argument that the Full Flow process does not use the patented method. As to Steag's argument that CFMT has not shown a sufficient nexus between the drying technology and the Full Flow's commercial success, the court disagrees. CFMT not only presented evidence that the drying step is an important one in the Full Flow process, but also presented evidence that its first customer, TI, was not satisfied with the Full Flow machine until CFMT had improved the drying step.

Steag showed, at most, that one of ordinary skill in the art of drying semiconductor wafers in 1988 would have known about a method that used IPA vapor, and would also have known about a method that pulls wafers slowly and steadily from rinsing fluid. However, Steag has not produced evidence to show some motivation for combining these two methods. In fact, CFMT produced evidence from the Mehta patent and the 1986 brochure that combining the methods was specifically to be avoided. The jury reasonably concluded that the '761 patent claims were not obvious to one of ordinary skill in the art at the time of the '761 patent application. Thus, the court will deny Steag's motion for judgment as a matter of law on this issue.

H. *Did the Jury Properly Find That the Invention Claimed in the '761 Patent Was Not Publicly Used or Sold More Than One Year Prior to CFMT's Patent Application?*

 Under 35 U.S.C. § 102(b), an inventor may not patent an invention if he or she placed the invention on sale or publicly used the invention more than one year prior to the date of application for a patent. Steag claims that CFMT violated this provision by selling the Full Flow equipment to TI in December, 1986, and then using the Full Flow equipment at TI's Sherman plant in early 1987, more than one year prior to filing its April 20, 1988 patent application.

CFMT argues that the system delivered to TI in 1986 and used in early 1987 was nothing more than the system disclosed in the 1986 brochure and claimed in the '532 patent. CFMT claims that this system used a chemical drying technique, and not the direct displacement method disclosed in the '761 patent. CFMT offered the testimony of McConnell and Walter, who each testified that they did not develop the direct displacement method until the summer of 1987.

The jury could reasonably conclude that the Full Flow equipment delivered to TI did not use the direct displacement method disclosed in the '761 patent, since the jury could reasonably have concluded that this method did not exist before CFMT shipped out the equipment. CFMT produced sufficient evidence to establish that McConnell and Walter invented the '761 drying method in the summer of 1987. Thus, the court will deny Steag's motion for judgment as a matter of law on this issue.

I. *Was CFMT's Conduct During the Prosecution of the '761 Patent Inequitable?*

1. *What is the standard for considering a claim of inequitable conduct?*

 Patent applicants have a duty to disclose information to the PTO with candor, good faith, and honesty, pursuant to 37 C.F.R. § 1.56(a) (1996). A breach of this duty, under certain conditions, can constitute inequitable conduct. *See Molins PLC v. Textron, Inc.,* 48 F.3d 1172, 1178 (Fed.Cir. 1995). Inequitable conduct arises where a patentee fails "to disclose material information, or [submits] false information, coupled with an intent to deceive." *Id.* A court may declare a party's patent to be unenforceable if it determines that the party obtained the patent through inequitable conduct. *See Critikon, Inc. v. Becton Dickinson Vascular Access, Inc.,* 120 F.3d 1253, 1259 (Fed.Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 1511, —— L.Ed.2d —— (1998).

The party alleging inequitable conduct must offer clear and convincing evidence that

the non-disclosed prior art is material, that the patent applicant knew of its materiality, and that the applicant intended to mislead the PTO. *Molins,* 48 F.3d at 1178. That is, the accusing party must establish that "threshold levels of [both] materiality and intent" exist. *Critikon,* 120 F.3d at 1256. Once these threshold levels are established, the court "conducts a balancing test" to determine whether inequitable conduct has occurred. *Id.*

### 2. Did CFMT fail to disclose material prior art?

■■■ Steag bases its claim of inequitable conduct on CFMT's failure to disclose to the PTO the 1986 Full Flow brochure, the 1987 advertisements, and the Rodel press release. CFMT points out that it did disclose the '532 patent to the PTO, which describes the Full Flow equipment in more detail than the brochure, advertisement, or press release does. Thus, CFMT argues, these other publications would be unnecessarily cumulative and are not material. Steag, however, claims that the '532 patent is not prior art to the '761 patent, because it does not meet any of the criteria for prior art listed in 35 U.S.C. § 102. Steag argues that the patent examiner was thus unable to reject the claims of the '761 patent for anticipation or obviousness in light of the prior art. In other words, Steag argues that although the '532 patent discloses the same drying process as the 1986 brochure, 1987 advertisements, and Rodel press release, CFMT acted inequitably by only disclosing the '532 patent and not the other publications, because the '532 patent itself does not qualify as "prior art."

Section 102 lists different types of publications or patents that qualify as prior art. These include: (1) a patent issued before the invention; (2) a publication patented more than one year prior to the patent application; and (3) a patent application "by another" filed before the patent application. The PTO issued the '532 patent on October 18, 1988, almost 6 months after CFMT filed the '761 patent application. Steag points out that the '532 patent was not issued before the invention, and was also not applied for "by another" before the '761 patent application, and thus argues that it is not prior art.

CFMT points out that the patent examiner lists the '532 patent on the first page of the '761 patent under "References Cited." CFMT also described the '532 invention in the "Background of the Invention" section of the '761 specification, under the subheading "Prior Art." CFMT claims that this is an admission that the '532 is prior art, and that this admission is binding. CFMT cites *Constant v. Advanced Micro–Devices, Inc.,* 848 F.2d 1560, 7 U.S.P.Q.2d 1057, 1063 (Fed. Cir.), *cert. denied,* 488 U.S. 892, 109 S.Ct. 228, 102 L.Ed.2d 218 (1988), where the Federal Circuit said that a "statement in a patent that something is in the prior art is binding on the applicant and patentee for determinations of anticipation and obviousness." CFMT argues that the '532 patent should be considered prior art, and thus that there was no need for CFMT to disclose the 1986 brochure and other documents describing the Full Flow process to the PTO.

It appears to the court that the '532 patent does qualify as prior art, due to the admission of CFMT. If so, any disclosure of the other publications would be cumulative and immaterial, and thus CFMT's conduct in the prosecution of the '761 patent was not inequitable. However, the court does not need to resolve the issue of whether the '532 is prior art. Even if the '532 patent is not prior art, the court finds that CFMT's disclosure of the '532 patent made the other publications immaterial. Steag admits that the patent examiner could (and did at one point in the prosecution) reject the '761 claims for "obviousness-type double patenting." This is a rejection of a claim where the patent examiner finds the patentee is attempting to extend the term of an earlier patent by presenting later claims that are an obvious variation on the original patent's claims. *See In re Goodman,* 11 F.3d 1046, 1052–53 (Fed.Cir.1993). Thus, CFMT gave the patent examiner an opportunity to consider the Full Flow's previous drying technique before allowing a patent on the new technique. Steag does not argue that the brochure's description of the Full Flow process is better than that of the '532 patent. Thus, the court finds that

CFMT did not fail to disclose any material prior art to the PTO.

Moreover, the court notes that, even if the non-disclosed publications were material, Steag has failed to establish that CFMT had the intent required for a finding of inequitable conduct. No evidence suggests that CFMT was trying to hide any information from the PTO—the '532 patent is, in McConnell's words, a "very precise" description of the invention. Thus, the court would not find that CFMT's conduct constituted inequitable conduct, even if the 1986 brochure, the 1987 advertisements, and the Rodel press release were material. The court will deny Steag's motion for judgment as a matter of law on this issue.

### J. Did the Jury Properly Award Damages?

At trial, CFMT's expert, Russell Parr, suggested that the jury should use a reasonable royalty rate of 9%, and apply it to the Steag's total sales of the Marangoni dryer and Steag wet benches containing a Marangoni dryer. The court instructed the jury that this number is $110,140,282. Parr calculated the appropriate damages to be approximately $9.9 million. Steag's expert, David Urey, suggested a royalty rate of 1 to 2%, and testified that the jury should apply this rate to sales revenues for Marangoni dryers and the Marangoni dryer component of wet benches. The court instructed the jury that this number is $20,700,000, and Urey calculated the appropriate damages to be approximately $414,000. The jury awarded CFMT damages of $3,105,000, and indicated that it used a royalty rate of 15%. It appears that the jury chose to apply the royalty rate to the lower sales number (Marangoni dryers plus the dryer component of wet bench sales). Steag now claims that the jury's use of a 15% royalty rate, a rate greater than either party's expert suggested, is wholly unsupported by the evidence, and thus that the court should lower it.

### 1. Should this question be resolved under a motion for judgment as a matter of law?

▮ CFMT first disputes the propriety of Steag's motion. In its original motion for judgment as a matter of law at the close of evidence, Steag did not raise the issue of an appropriate royalty rate. Steag claims it could not have foreseen that the jury would choose a royalty rate greater than both experts' suggestions. However, CFMT cites *Orthokinetics, Inc. v. Safety Travel Chairs, Inc.*, 806 F.2d 1565, 1579 (Fed.Cir.1986), and *Cruz v. Local Union No. 3*, 34 F.3d 1148 (2d Cir.1994) for the proposition that a party may not move for judgment as a matter of law on an issue not raised in its initial motion. In *Cruz*, the Second Circuit noted that "nobody can know what damage verdict, if any, the jury will return," but still rejected defendant's effort to move for judgment as a matter of law on damages after the jury verdict, when defendant had failed to list this issue in its original motion at the close of evidence.

Steag's argument about damages, however, is not best understood as a motion for judgment as a matter of law. Steag does not allege that CFMT failed to present sufficient evidence that would support any verdict for damages. Instead, Steag claims that the jury verdict is unsupported by the evidence. Steag argues that an appropriate royalty rate would be between 1% and 9%, and thus that this particular jury verdict should be rejected. This issue is best resolved in the context of a motion for a new trial, under Rule 59.

Steag's motions include one for a new trial. In its brief on that motion, Steag does not specifically address the damages issue. However, Steag does incorporate by reference its discussion of the evidence in its brief on the motion for judgment as a matter of law. Steag analyzes in detail the evidence on damages and a reasonable royalty rate in that brief. The court finds that this is sufficient for it to consider the damages issue in the context of a motion for a new trial.

### 2. What standard should the court apply when considering a motion for a new trial?

Rule 59 of the Federal Rules of Civil Procedure allows the court to grant a new trial to a party "for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States." Such reasons include: (a) the court

improperly instructed the jury; (b) the verdicts are against the weight of evidence; or (c) evidence was improperly excluded from the jury's consideration. *See* 12 *Moore's Federal Practice* §§ 59.20–26 (1997). A court should only grant a new trial on the basis that the verdict was against the weight of evidence and the "failure to do so would result in injustice, or would shock the conscience of the court." *Windsor Shirt Co. v. New Jersey Nat'l Bank,* 793 F.Supp. 589, 595 (E.D.Pa.1992), *aff'd,* 989 F.2d 490 (3d Cir. 1993).

*3. Was the jury's choice of a 15% royalty rate so unreasonable as to result in injustice?*

■■■ The court instructed the jury at the close of trial that it should determine a reasonable royalty rate, if it found that the patent was infringed and valid. The court explained that a reasonable royalty rate is "the amount of money that would be agreed to in an a hypothetical arm's length negotiation" between Steag and CFMT at the time that Steag commenced its alleged infringement. *See Georgia–Pacific Corp. v. United States Plywood Corp.,* 318 F.Supp. 1116, 1120 (S.D.N.Y.), *modified and aff'd,* 446 F.2d 295, 302 (2d Cir.1971). The court listed 14 factors that the jury should consider, including royalty rates paid by Steag or received by CFMT for licensing other comparable patents, the amount of profits that should be credited to the invention, expert opinions, and any other economic factors that a normally prudent businessperson would consider in negotiating the hypothetical license.

The court also instructed the jury that if it found that the reasonable royalty rate should be applied to sales of stand-alone Marangoni dryers and the dryer component of the wet bench, the sales revenues were $20,700,000, but if it found that the royalty rate should be applied to sales of the stand-alone dryers and full wet bench, the sales revenues were $110,140,282. Steag argued to the jury that it should apply a royalty rate of 1% or 2% to the smaller number. CFMT argued that the jury should apply a rate of 9% to the bigger number. The jury apparently chose to apply a rate of 15% to the smaller number, and arrived at a damages award of $3,105,000,

which falls between CFMT's suggestion of $9.9 million and Steag's suggestion of $414,000.

Steag claims that the jury verdict cannot be supported by the evidence at trial, because the jury chose a royalty rate that is greater than both CFMT's expert, Parr, and Steag's expert, Urey, suggested would be appropriate. However, the experts also explained the bases for their opinions. For instance, Parr testified that a rational range for possible royalty rates would be 0 to 15 percent. He also explained why he believed that in this case a reasonable rate would be at the higher end of that range. While the jury ultimately chose a rate higher than Parr suggested, the jury did choose a rate within his "reasonable" range.

The jury's selection of a royalty rate different than the rates suggested by each expert does not, alone, make the verdict unreasonable. The jury was not required to choose a royalty rate suggested by either party's damages expert. In fact, the court listed expert opinions as only one factor to consider in determining a reasonable royalty rate. The jury was entitled to consider all relevant factors.

Steag argues that most other factors would suggest a lower rate. For instance, Steag's sister corporation in Germany pays 5% on a license with Philips. Many other companies in the computer field charge a licensing rate of less than 5%. However, CFMT produced evidence that the '761 patent was especially valuable to the company, that it was integral to the Full Flow machine, and that the company would have been reluctant to license the technology at all. The jury could justifiably conclude that the appropriate royalty rate in this case should be higher than that of a typical license. The court also notes that the number the jury ultimately chose, $3,105,000, is less than 3% of the sales revenue that Parr testified the jury should use. Such a royalty rate is well within the range of rates that the experts suggested. Thus, the court will deny Steag's motion for a new trial on this issue.

*K. Should the Court Grant Steag's Motion for New Trial on Any Other Basis?*

Steag raises two major arguments in its brief on its motion for a new trial. First,

Steag argues that the jury verdict was against the great weight of evidence. The court has already considered these arguments in the context of Steag's motion for judgment as a matter of law on each of the issues litigated at trial. The court has found that the jury's verdict was reasonable on each issue litigated except the doctrine of equivalents. Since the court found that the verdict against Steag on the issue of direct infringement was reasonable, the reversal of the doctrine of equivalents verdict does not alter the outcome of the case. The court does not find that the jury's verdict on any of the issues results in injustice.

Steag also argues that the court improperly refused to instruct the jury that the '532 patent is not prior art to the '761 patent. Again, the court has already found above (when considering Steag's motion for judgment as a matter of law on the issue of inequitable conduct) that the '532 patent's status as prior art bears no impact on the inequitable conduct analysis. Moreover, the court has also explained that the '532 patent appears to be prior art. Thus, the court rejects both of Steag's arguments for a new trial, and will deny Steag's motion for a new trial.

III. *CONCLUSION*

For the reasons set out above, the court will deny Steag's motion for judgment on a matter of law on all issues except that of infringement under the doctrine of equivalents. The court will grant Steag's motion for judgment as a matter of law on the issue of infringement under the doctrine of equivalents, and will order the clerk to enter judgment for Steag and against CFMT on this issue. The court will also deny Steag's motion for a new trial, and CFMT's motion for treble damages or to declare this case exceptional.

The court will issue an order in accordance with this opinion.